UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| FERNANDO S. NARRO, § | |
| TDCJ # 02101682, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. 3:16-CV-0310 |
| § | |
| E EDWARDS, *et al*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Fernando S. Narro, an inmate in the Texas Department of Criminal Justice–Correctional Institutions Division ("TDCJ"), proceeds *pro se* and *in forma pauperis*. He filed this lawsuit against six Defendants claiming that they used excessive force against him while he was a pretrial detainee in the Brazoria County Detention Center. Defendants filed a motion to dismiss (Dkt. 13), to which Plaintiff has not responded. Defendants also have filed motions for summary judgment (Dkt. 17, Dkt. 18), to which Plaintiff has responded (Dkt. 22) and Defendants have replied (Dkt. 24, Dkt. 25). The motions are ripe for decision. After reviewing all of the evidence submitted, the parties' briefing, the applicable law, and all matters of record, the Court concludes that summary judgment should be **granted** for Defendants and Narro's claims should be **dismissed** with prejudice.

### I. BACKGROUND

Plaintiff claims that Defendants violated his constitutional rights when they used excessive force against him at the Brazoria County Detention Center. He brings suit

against six officers at the detention center: Colton Edwards; Daniel Duminski;[1] Darren Mowery; Sean Killgore; D.O. Stanford; and Michael Gregory (Dkt. 1). The Brazoria County District Attorneys' Office has appeared on behalf of all Defendants except Stanford, and states that "[t]he Brazoria County Sheriff's Office . . . employed no detention officer with this name at the time of the alleged incident made the basis of this lawsuit" (Dkt. 13, at 1 n.1). Killgore and Gregory have submitted affidavits stating that they did not participate in the use of force.[2] Edwards, Duminski, and Mowery were involved in the incident and have provided affidavits (Dkt. 17-20; Dkt. 17-21; Dkt. 17-22).

Narro alleges that at approximately 2:00 a.m. on September 26, 2016, Defendant Edwards told him that he needed to move to a different cell because his cell's night light was out (Dkt. 1, at 3). Edwards explains in his affidavit that he decided to move Plaintiff because his cell was "completely dark," and because "a cell two or three doors down . . . had just come available" when several inmates were transferred to TDCJ (Dkt. 17-20, at 1, ¶ 3). Nightlights allow officers to observe inmates and conduct welfare checks (*id*.; Dkt. 17-22, at 1, ¶ 4).

Narro states that he refused the officers' orders "at first" (Dkt. 1, at 3). After Plaintiff refused to comply with Edwards' instructions to move, Edwards called for a

---

[1] In his pleadings, Plaintiff identifies as Duminski as "Sgt. Diminski."

[2] *See* Dkt. 18-25, at 1, ¶ 3 (Killgore was "not present when this incident [with Narro] took place," and did not participate in or witness the use of force); Dkt. 18-26, at 1, ¶ 4 (Gregory arrived outside the "violent cell" after Plaintiff had been restrained and did not participate in the use of force).

supervisor. Defendants Duminski and Mowery, along with other officers, then arrived at Plaintiff's cell (Dkt. 17-20, at 2, ¶ 5; Dkt. 17-21, at 1, ¶¶ 4-5; Dkt. 17-22, at 1, ¶ 3). A video recorded from the corridor shows several officers arriving at the door to the cell (Dkt. 17-17, at 1:30-2:00).

Duminski again instructed Plaintiff to move to a different cell. Plaintiff alleges that when he asked Duminski why he suddenly needed to move, since his light had been out for nearly three days, Duminski got "upset" and started to "holler" and "shout" (Dkt. 1, at 4). Narro then alleges as follows:

> Next thing I know I get blindsided by a[n] officer, Sgt. [Duminski] comes and slams my head into the wall, as well as the railing to my bunk. So I try to protect myself by putting hands by head. Sgt. [Duminksi], D.O. Mow[e]ry, D.O. Ki[l]lgore, D.O. E. Edwards, D.O. Stanford, D.O. Gregory, and a[n] unknown black officer all start punching me. Mostly in the facial/head area. I'm still in my mat[tress] cover while all this is happening. So I'm really no threat. They get me in hand restraints and transport me to a mental cell. While in mental cell these officers [and] Sgt. [Duminski] continue the assault while I'm in hand restraints until nurse arrives. The nurse bandage[s] my forehead and leaves. While the assault took place in mental cell Sgt. [Duminski] put his fingers in my eye sockets. Sgt. [Duminski] also had on rings the whole time this assault took place. I never seen no camcorder. Also no pictures or real medical exam were taken.

(Dkt. 1, at 4).

Duminski, Edwards, and Mowery submit affidavits averring that Narro refused Duminski's instructions, resisted and threatened the officers, kicked, swung his fists, and thrashed his body. Edwards states that Narro sat up and "square[d] his body toward Sergeant Duminski," warned Duminski that he had Mexican Mafia connections, and "raised up his fists, which were clenched" (Dkt. 17-20, at 2, ¶ 7). Mowery states that

Narro's movements were "aggressive" to Duminski and that he "took a posture that looked like he was going to engage in an altercation" (Dkt. 17-21, at 2, ¶ 6). Duminksi recounts that Narro cursed and threatened officers when he "stated that he had ties to the Mexican Mafia gang," "sat up straight on his bed and tensed up," and "raised his fists up to his chest" (Dkt. 17-22, at 2, ¶ 5). These affidavits are corroborated by contemporaneous incident reports by multiple officers, which are included in the Use of Force Report (Dkt. 17-15).[3] Duminski further states that, after Plaintiff raised his fists, he "considered instructing all jailers to exit the cell," but decided against it for safety reasons.[4]

Edwards and Mowery eventually cuffed Plaintiff's left arm. Mowery recounts that Narro "used his legs to try to push off of us and anything he could use to leverage his legs," was "constantly trying to pull his arms way," and "continually turned his upper body so it was difficult to control him" (Dkt. 17-21, at 2, ¶ 7). *See* Dkt. 17-20, at 2, ¶ 7 (Edwards states that Narro was thrashing, kicking, and pulling his arms away as they tried to cuff him). Duminski was attempting to handcuff Narro's right arm and states

---

[3] *See* Dkt. 17-15, at DEF0243 (Holmes); *id*. at DEF0244-DEF0245 (Duminski); *id*. at DEF0246 (Edwards); *id*. at DEF0247 (Mowery); *id*. at DEF0248 (Cotton); *id*. at DEF0249 (Middleton).

[4] *See* Dkt. 17-22, at 2, ¶ 6 ("[T]he cell was very dark, making it difficult to see, and Mr. Narro was taking an aggressive posture towards us. I felt that if we backed out of the cell, Mr. Narro might attack us. I was also concerned that it would be difficult to return and be able to move Mr. Narro, as he was agitated and the cell was completely dark. At the time, I did not see that Mr. Narro's legs were inside his mattress cover.").

that, when Narro swung a closed fist at Duminksi's head and prepared to swing again, Duminski struck Narro once on the head:

> I initially had control of Mr. Narro's right arm as Deputy Mowery and Deputy Edwards were trying to handcuff his left arm. However, Mr. Narro pulled his right arm out of my grasp and swung his fist at my head. Mr. Narro's punch did not hit me, but it was close—I felt the air as his fist passed my head. I saw Mr. Narro was preparing to swing his fist back at me a second time. Before Mr. Narro could do this, I struck him in the right side of the head with my fist. I did not intend to strike Mr. Narro in the head, but I reacted as quickly as possible to avoid being hit.

(Dkt. 17-22, at 2, ¶ 7; *see* Dkt. 17-15, at DEF0242, DEF0244). Immediately after, Duminski gained control of Plaintiff's right arm and was able to handcuff him with Edwards' assistance (Dkt. 17-22, at 2, ¶ 7; *see* Dkt. 17-20, at 2, at ¶ 7).

Sometime after Narro was handcuffed, the officers began to record the incident.[5] On the video (Dkt. 17-16), the struggle is visible in the dark cell and Plaintiff is audible, speaking belligerently and cursing. However, given the poor lighting and the angle of the video recording, each person's actions are difficult to discern.

Duminski states that, although Narro was handcuffed, he continued to kick his legs and resist (Dkt. 17-22, at 2, ¶ 8). He claims that, because Narro knocked him off balance, he pulled Narro to the floor:

> Once Mr. Narro was handcuffed, he continued to pull away, turn his body, kick at Deputy Edwards and me, and threaten us. As Deputy Edwards and I attempted to get Mr. Narro to stand, he kicked his legs at me and knocked me off balance. This caused me to temporarily lose control of Mr. Narro. I then pulled Mr. Narro down to the floor, where I restrained him until the jailers could remove the mattress cover from around his legs.

---

[5] *See* Dkt. 17-15, at DEF0250 (Deputy Barrett states in the Use of Force Report that he "heard yelling on the front side of A-row" and "grabbed the camera" and went to film the incident).

(*Id.*). The officers are visible on the video working to remove the mattress cover that was wrapped around Plaintiff's legs (Dkt. 17-16, at 00:10-00:30). Edwards states that Narro continued to kick while he and Mowery removed the bedding (Dkt. 17-20, at 3, ¶ 8), and Officer James Middleton recounts that, because of the kicking, he assisted by placing pressure on Narro's back while other officers unwrapped his legs (Dkt. 17-24, at 1, ¶ 5). The officers then pulled Narro to his feet and escorted him to another cell (Dkt. 17-16, at 00:40-1:20), which Defendants refer to as the "violent cell."

In the violent cell, the video shows Plaintiff continuing to thrash, kick, and speak belligerently as the officers attempt to restrain him (Dkt. 17-16, at 1:20-2:00). Edwards avers that Narro's left leg hit Edwards in the face above his eye (Dkt. 17-20, at 3, ¶ 9). Less than two minutes after Narro entered the violent cell, the video shows a nurse arriving at the cell and treating him as several officers continue to restrain him (Dkt. 17-16, at 3:05-3:50). The officers state that they cut off Plaintiff's clothing, and can be seen on the video tossing the clothing out of the cell (Dkt. 17-16, at 7:30-9:00; Dkt. 17-20, at 3, ¶ 10; Dkt. 17-21, at 3, ¶ 8). They removed his handcuffs and backed out of the cell, closing the door quickly behind them (Dkt. 17-16, at 10:00-10:30). Duminski states that, as the deputies backed out of the cell, Narro "jumped to attack them," but that Sergeant Holmes "raised a pepper spray can" and Narro then backed away (Dkt. 17-22, at 3, ¶ 10).

In his summary judgment response, Plaintiff maintains that the "paperwork and statements made by the Defendants" demonstrate that "Defendants are in fact lieing [sic] about what took place," that "Defendants' story changes," and that "Defendants

contradict themselves" (Dkt. 22, at 2). Plaintiff does not direct the Court's attention to any specific contradictions or inconsistencies in Defendants' statements, reports, or affidavits. He maintains that he didn't speak to Duminski in a threatening manner, that he was calm, that he was "blindsided" by an officer, that he did not resist the officers, and that Defendants assaulted him "with the excuse I was resisting them and making threats" (*id*.). He asserts that Defendants only asked him to move cells two times, and that he agreed to move on the third request (*id*. at 3). He also claims that he was only handcuffed after Defendants assaulted him "so I could no longer block and protect myself from their blows to the body and head area," and that Defendants' allegation that Plaintiff had "swung at them" is "a lie" (*id*.). He submits a witness statement from Julio Villarreal, another inmate who overheard the use of force and Narro's protests.[6]

Plaintiff was cut on his left temple during the incident. The cut was less than one centimeter long, and was sterilized and bandaged by the nurse who came to the violent cell shortly after Plaintiff arrived there (Dkt. 17-15, at DEF0257).[7] Plaintiff alleges additional injuries:

> I had to put in a sick call for pain medication and swelling in both ears. They were both black and blue for almost a week. My lower side close to pelvis was bruised as well as abrasion on forehead, cut on inside left ear. I still have pain off and on from this assault.

---

[6] Dkt. 22, at 8 (Villarreal states that Plaintiff's cell light had been out "for a few nights" at the time of the incident, that Narro said "I am not the one," that Narro "wanted to stay [in the same cell] in case he had a seizure," and that Narro "said y'all going to beat me up while . . . in handcuffs").

[7] Sergeant Stacy Holmes, who assisted in the incident but is not named as a Defendant, states in an affidavit that, from his observation, "it appeared Mr. Narro's head was cut on the bed rail as the officers tried to restrain Mr. Narro against the wall to handcuff him while he thrashed and resisted" (Dkt. 17-23, at 2, ¶ 5).

(Dkt. 1, at 4). His sick call slip, dated September 27, 2016, stated that his ears were purple and swollen (Dkt. 22, at 6). Clinic records indicate that Plaintiff was treated again three days after the incident and was prescribed Motrin (Dkt. 17-15, at DEF0226). In October and November, Plaintiff was treated at the clinic for apparently unrelated issues, and reported no pain or distress (*id.* at DEF0225-DEF0226). Although Plaintiff alleges that "Defendants caused me damage to require me to rec[ei]ve pain medication for my shoulder till this day" (Dkt. 22, at 1), he does not provide any citation to clinic records or any further information supporting this allegation.

Along with his complaint, Narro submitted a copy of an inmate grievance form he filed on September 27, 2016 (Dkt. 1-1). The disposition of his step one grievance is not clear from the record before the Court. Defendants maintain that Plaintiff never filed an appeal from the grievance, and therefore that his administrative remedies are not exhausted (Dkt. 17, at 10-12). They submit an affidavit from the detention center's grievance officer, who avers that he received the grievance form dated September 27, 2016, but is "not aware of any appeal filed by Mr. Narro under the Inmate Grievance Plan in regard to the grievance he submitted" (Dkt. 17-27, at 1, ¶ 3). On his form Complaint in this case, when asked whether he had appealed the grievance, Plaintiff checked the box for "no" and wrote, "My case is still under investigation" (Dkt. 1, at 2).[8] In his summary judgment response, Narro claims that he "did in fact file a Step 2 grievance to the Sheriff

---

[8] Defendants state that, at the time, the Use of Force investigation was still in process, and that the investigation later concluded that Defendants had not violated any policy guidelines (Dkt. 17, at 12; Dkt. 17-15, at DEF0232).

of Brazoria County 'Charles Wagner'" but that "Sheriff Wagner never answered my Step 2 Gri[e]vance" (Dkt. 22, at 1).

Defendants present evidence that Plaintiff was classified in detention as a maximum security risk (Dkt. 17, at 4; Dkt. 17-12, at DEF0005, DEF0070-DEF0071), and that officers previously had been instructed that he was a dangerous inmate (Dkt. 17, at 5; Dkt. 17-14). Over multiple years in detention, Narro had accrued twenty-seven disciplinary incidents, including fighting with other inmates, possession of sharp objects, attempting to stab and strike officers, and threatening to kill officers (Dkt. 17, at 4-5; Dkt. 17-13). Defendants also present evidence of Plaintiff's numerous convictions for violent crimes (Dkt. 17-2; Dkt. 17-3; Dkt. 17-4; Dkt. 17-5; Dkt. 17-6; Dkt. 17-7, at DEF0214-DEF0217; Dkt. 17-12, at DEF0066-DEF0069).

Plaintiff filed this suit on October 31, 2016, in the United States District Court for the District of Maryland (Dkt. 1). On November 1, 2016, the Maryland court transferred the case to this Court (Dkt. 4).

## II. STANDARDS OF REVIEW

### A. *Pro Se* Pleadings

In reviewing the pleadings and litigation history, the Court is mindful of the fact that Plaintiff proceeds *pro se*. Complaints filed by *pro se* litigants are entitled to a liberal construction and, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted). Even under this lenient standard a *pro se* plaintiff must allege more than "'labels and conclusions' or a 'formulaic recitation of the

elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). Regardless of how well-pleaded the factual allegations may be, they must demonstrate that the plaintiff is entitled to relief under a valid legal theory. *See Neitzke v. Williams,* 490 U.S. 319, 327 (1989); *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1997).

### B. Summary Judgment—Rule 56

Defendants have moved for summary judgment. Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Curtis v. Anthony,* 710 F.3d 587, 594 (5th Cir. 2013). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Id*. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id*. The nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (citation and internal quotation marks omitted).

In deciding a summary judgment motion, the reviewing court must "construe all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotation marks omitted). However, the non-movant cannot avoid summary judgment simply by presenting "conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *Jones v. Lowndes Cnty.*, 678 F.3d 344, 348 (5th Cir. 2012) (internal citation, alteration and quotation marks omitted); *see Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Likewise, Rule 56 does not impose upon the Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. Evidence not referred to in the response to the motion for summary judgment is not properly before the Court, even if it exists in the summary judgment record. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

## III. ANALYSIS

### A. Exhaustion of Administrative Remedies

Defendants seek summary judgment on exhaustion grounds. Administrative exhaustion is mandatory under the Prisoner Litigation Reform Act, and an inmate bringing an action regarding prison conditions under 42 U.S.C. § 1983 or other federal law must first exhaust all administrative remedies "as are available." 42 U.S.C. § 1997e(a). *See Ross v. Blake,* 136 S. Ct. 1850 (2016); *Jones v. Bock*, 549 U.S. 199, 212 (2007); *Wilson v. Epps*, 776 F.3d 296, 301 (5th Cir. 2015). The Fifth Circuit strictly

In deciding a summary judgment motion, the reviewing court must "construe all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotation marks omitted). However, the non-movant cannot avoid summary judgment simply by presenting "conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *Jones v. Lowndes Cnty.*, 678 F.3d 344, 348 (5th Cir. 2012) (internal citation, alteration and quotation marks omitted); *see Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Likewise, Rule 56 does not impose upon the Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. Evidence not referred to in the response to the motion for summary judgment is not properly before the Court, even if it exists in the summary judgment record. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

## III. ANALYSIS

### A. Exhaustion of Administrative Remedies

Defendants seek summary judgment on exhaustion grounds. Administrative exhaustion is mandatory under the Prisoner Litigation Reform Act, and an inmate bringing an action regarding prison conditions under 42 U.S.C. § 1983 or other federal law must first exhaust all administrative remedies "as are available." 42 U.S.C. § 1997e(a). *See Ross v. Blake,* 136 S. Ct. 1850 (2016); *Jones v. Bock*, 549 U.S. 199, 212 (2007); *Wilson v. Epps*, 776 F.3d 296, 301 (5th Cir. 2015). The Fifth Circuit strictly

enforces the exhaustion requirement. *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).

Defendants maintain that Plaintiff never filed an appeal from his inmate grievance, and therefore did not completely exhaust his remedies. Plaintiff claims that he filed a "step 2" grievance but did not receive a response (Dkt. 22, at 1). He does not provide a copy of his appeal. Given that the incident occurred on September 26, 2016, and Plaintiff signed his complaint on October 23, 2016 (Dkt. 1), it is unclear whether Plaintiff could have pursued his administrative remedies "to conclusion" before filing suit, as the law requires. *See Wilson*, 776 F.3d at 301.

Because Narro has not presented evidence establishing exhaustion of his administrative remedies, his complaint is subject to dismissal on that basis. In any event, Defendants are entitled to summary judgment on the merits of his excessive force claim, for the reasons explained below.

### B. Fourteenth Amendment Excessive Force Claim

Plaintiff claims that Defendants used excessive force against him during his pre-trial detention, in violation of his Fourteenth Amendment rights. Defendants Edwards, Mowery, and Duminski have moved for summary judgment on the excessive force claim and on qualified immunity grounds (Dkt. 17). Defendants Killgore and Gregory filed a separate motion for summary judgment, presenting evidence that they were not involved in the use of force (Dkt. 18). To defeat summary judgment, Plaintiff must demonstrate a genuine issue of material fact on all elements of the case for which he bears the burden of proof. *See Firman*, 684 F.3d at 538.

A pretrial detainee bringing a claim of excessive force must show that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The reasonableness determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*. The plaintiff must show "that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id*. at 2473-2474. Courts must "account for the legitimate interests that stem from the government's need to manage" a detention facility, and must defer to officials' policies and practices that are necessary to preserve institutional order, discipline, and security. *Id*. at 2473 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)) (internal quotation marks and alteration omitted).

When determining whether the force used was reasonable or unreasonable, courts look to the non-exhaustive factors set out in *Kingsley*: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*.

Defendants have invoked qualified immunity, and Plaintiff bears the burden to negate the defense. *See Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017). Determination of qualified immunity requires a bifurcated analysis: first, the court must decide "whether the undisputed facts and the disputed facts, accepting the plaintiffs'

version of the disputed facts as true, constitute a violation of a constitutional right"; and second, the court must determine "whether the defendant's conduct was objectively reasonable in light of clearly established law." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (internal quotation marks and citation omitted); *see Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 181 (5th Cir. 2016) (internal citation and quotation marks omitted). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Hanks*, 853 F.3d at 744 (internal citations and quotation marks omitted).

In the case at bar, Defendants argue that the record contains no genuine issue of material fact as to whether the force they used against Narro was objectively reasonable. Applying the *Kingsley* factors, Defendants cite the Court to evidence that Plaintiff posed a severe security problem, based on his past violent acts and his maximum security classification (Dkt. 17-12, at DEF0005, DEF0070-DEF0071; Dkt. 17-13; Dkt. 17-14). Defendants also maintain that they reasonably perceived a threat from Plaintiff because he refused their verbal commands, spoke belligerently and threatened the officers, and attempted to kick and hit them, among other actions. The affidavits and video evidence submitted by Defendants demonstrate that Plaintiff kicked, twisted his body, and made other moves to resist being handcuffed and moved to a different cell (Dkt. 17-16, at 00:01-02:00; Dkt. 17-20; Dkt. 17-21; Dkt. 17-22; Dkt. 17-23; Dkt. 17-24). This active

resistance by Narro is relevant to the Court's analysis under *Kingsley*, and supports Defendants' position that their use of force was reasonable.

Defendants also present evidence that they attempted to "temper and limit the amount of force," see *Kingsley*, 135 S. Ct. at 2473, by making repeated verbal instructions and restraining Plaintiff in the face of his aggression. When the situation escalated, Duminksi considered instructing the officers to exit Narro's cell, but decided that safety considerations counseled against it (Dkt. 17-22, at 2, ¶ 6). Duminski states that he struck Narro one time because Narro had attempted to hit him, and that he pulled him to the ground only after Narro had knocked him off balance (*id*. ¶¶ 7-8). Edwards and Duminski state that, after Narro stopped resisting, they reduced the pressure used against him (Dkt. 17-20, at 3, ¶ 9; Dkt. 17-22, at 2, ¶ 9). Narro's injuries were limited to an abrasion on his forehead and a bruised right ear (Dkt. 17-15, at DEF0225-DEF0228). All of this evidence further supports the reasonableness of Defendants' conduct under *Kingsley*.

In response to the summary judgment motion, Plaintiff alleges that he was calm and did not resist the officers (Dkt. 22, at 2-3). His allegations are not substantiated by the Use of Force Report, the officers' affidavits and contemporaneous reports, the medical records, or the video evidence.[9] Rather, the evidence of record is contrary to his allegations. Narro's conclusory statements in his briefing that Defendants are "lying" are insufficient to defeat summary judgment. See *Jones*, 678 F.3d at 348 (non-movant

---

[9] The Supreme Court has held that, on summary judgment, reliance on video evidence is appropriate. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

cannot avoid summary judgment by presenting conclusory allegations and denials). Although he asserts that Defendants "contradict themselves" and that their "story changes," (Dkt. 22, at 2), he points to no such contradictions, and no material inconsistency is apparent on the current record. Finally, the statement from inmate Villarreal, who states that he overheard Narro protesting against the officers' instructions and use of force (Dkt. 22, at 8), does not assert facts directly relevant to the *Kingsley* analysis and does not prevent summary judgment.

Applying the factors in *Kingsley*, 135 S. Ct. at 2473, Narro has failed to demonstrate a genuine issue of material fact as to whether the force Defendants used against him was "objectively unreasonable." Defendants are entitled to summary judgment on Plaintiff's excessive force claim. In addition, for essentially the same reasons, Defendants are entitled to qualified immunity. *See Carroll*, 800 F.3d at 169.

## IV. <u>CONCLUSION</u>

For the reasons stated above the Court **ORDERS** that:

1. Defendants' motions for summary judgment (Dkt. 17, Dkt. 18) are **GRANTED**. All of Plaintiff's claims are **DISMISSED with prejudice**.

2. All other pending motions are **DENIED as moot**.

A separate final judgment will issue.

SIGNED at Galveston, Texas, this 28th day of August, 2018.

_____
George C. Hanks Jr.
United States District Judge